657 So.2d 987 (1995)
Kathleen ARCHON, et al.
v.
UNION PACIFIC RAILROAD, et al.
MELTON TRUCK LINES
v.
MISSOURI PACIFIC RAILROAD.
Nos. 94-C-2728, 94-C-2743.
Supreme Court of Louisiana.
June 30, 1995.
*988 Paul H. Due, Donald Wayne Price, Thomas M. Abrusley, Due, Caballero, Price & Guidry, Baton Rouge, for applicant in No. 94-C-2728.
Donald Coleman Brown, Woodley, Williams, Fenet, Boudreau, Norman & Brown, Lake Charles; James T. Guglielmo, Charles M. Jarrell, Guglielmo, Lopez, Tuttle, Hunter & Jarrell, Opelousas, for respondent in No. 94-C-2728.
Donald Coleman Brown, Woodley, Williams, Fenet, Boudreau, Norman & Brown, for applicant in No. 94-C-2743.
Paul H. Due, Donald Wayne Price, Thomas M. Abrusley, Due, Caballero, Price & Guidry; James T. Guglielmo, Charles M. Jarrell, Guglielmo, Lopez, Tuttle, Hunter & Jarrell, for respondent in No. 94-C-2743.
CALOGERO, Chief Justice[*].
We granted certiorari in this case to address several issues, the most important of *989 which is whether the Louisiana Department of Transportation and Development ("DOTD") should be held liable to the plaintiffs in a wrongful death action for its failure to install active warning devices at a railroad crossing on a particular parish road in Allen Parish. In favor of the plaintiffs, the Third Circuit Court of Appeal affirmed a judgment holding DOTD liable.
Under the facts of this case and for the reasons set forth below, we affirm. We also affirm the lower court's decision regarding the other issues raised by the parties, namely, that the trial court did not err (or committed only harmless error) in admitting certain evidence and testimony over DOTD's 23 U.S.C. § 409 objection; that in this case, DOTD is not shielded from negligence liability under the discretionary function exception of LSA-R.S. 9:2798.1; and that DOTD had sufficient actual or constructive notice of the defects at the Van-Ply crossing for purposes of LSA-R.S. 9:2800. The lower courts' allocation of fault is also affirmed.
On June 16, 1989, Alvin Archon ("Archon"), a professional truck driver for Melton Truck Lines, was killed when the sixty foot logging truck he was driving was struck by a northbound Missouri Pacific train at the Van-Ply crossing outside of Oakdale, Louisiana. Archon had just picked up a load of plywood at the Boise Cascade plant, located on Van-Ply Road, an Allen Parish road just east of the Missouri Pacific railroad tracks that run parallel to, and near, U.S. Highway 165. The crossing consists of two tracks, a through track to the west and a side track to the east. At the time of the accident, the only warning signs were two faded crossbucks at the crossing and an "RR" sign 985 feet from the tracks.
After picking up his load, Archon left the plant and headed west on Van Ply Road toward the tracks and Highway 165. He was travelling at a very slow rate of speed, described by witnesses as "a creep," or "idling." As Archon approached the tracks, he discovered a boxcar on the side track to his left 157 feet south of the crossing. This box car blocked Archon's view down the tracks for approximately 4 to 8 seconds.[1] Johnny Laird, a truck driver several truck lengths behind Archon on Van-Ply Road, saw Archon's brake lights come on as Archon approached the side track. He also saw a puff of smoke from the exhaust of Archon's truck as Archon pulled onto the main tracks, indicating that Archon had accelerated. There is conflicting testimony as to whether the train blew its whistle as it approached the crossing. Archon's truck was hit and Archon was killed.
Archon's surviving wife and four children brought wrongful death and survival actions against the Missouri Pacific Railroad ("the Railroad"), DOTD, and the Allen Parish Police Jury ("the Police Jury" or "the Parish"). Archon's employer, Melton Truck Lines, and its insurer, Audubon Indemnity Company, filed suit to recover their worker's compensation payments and property damage for the wrecked truck. Prior to trial, all plaintiffs settled their claims with the Railroad. The Archon plaintiffs and Melton Truck Lines settled the compensation intervention. The case then proceeded to trial against DOTD and the Police Jury.
Following a bench trial, the trial court found the Railroad, Archon, DOTD, and the Police Jury at fault. The court assigned 36% fault to the Railroad, 32% to Archon, 22% to DOTD, and 10% to the Police Jury. The Archon plaintiffs and Audubon were awarded damages in the judgment which was rendered June 10, 1993. An amended judgment was rendered on July 23, 1993, following a motion for new trial to correct the identity of the plaintiffs in the earlier judgment.
DOTD and the Police Jury appealed. The Third Circuit Court of Appeal affirmed the liability findings and allocation of fault but modified the judgment to provide for prejudgment interest pursuant to Louisiana Civil Code article 2924.
*990 DOTD and the plaintiffs filed applications for writs with this Court. The Court granted both writ applications and heard arguments in the matter. What in part interested the Court was the fact that this case was perhaps distinguishable from Rick v. State, DOTD, Nos. 93-1776 and 93-1784 (La. 1/14/94), 630 So.2d 1271. In Rick, DOTD allowed a seventeen-month delay after the site was inspected before securing the upgrade plans and estimates from the railroad; in this case, only a few months had passed after inspection before such response was obtained. Upon review of the record and the judgment below, we determine that this distinction, however valid, is of no solace to DOTD, for it has now become apparent that the court of appeal properly affirmed DOTD's liability and its 22% causative fault because DOTD had assumed a duty at a much earlier time regarding the Van-Ply crossing, the breach of which contributed to Archon's accident.
The primary application is that of DOTD; the plaintiffs' writ application is protective in nature. In the event the Court modifies the percentage of fault assigned to DOTD or the Police Jury, the plaintiffs would have us allocate that disallowed percentage of fault to the Police Jury.[2] DOTD's arguments focus on three primary issues: 1) liability; 2) LSA-R.S. 9:2798.1's discretionary function exception; and 3) document admissibility. We will address each of these in turn.

I. Liability

DOTD argues that the lower courts erred in finding that it had a duty to maintain or signalize the Van-Ply crossing, that it breached that duty, and that such breach was a cause-in-fact of Archon's death. DOTD further contends that it had no notice of any defect at the crossing and thus, under LSA-R.S. 9:2800, it cannot be held liable for damages arising out of the accident.[3]
After reviewing the facts and considering the law as well as the arguments of the parties, we hold that DOTD is liable to the plaintiffs for the death of Alvin Archon. We find that DOTD had a duty to install active warning devices at the Van-Ply crossing as a result of a series of agreements between the Department of Highways (predecessor to DOTD) and Missouri Pacific Railroad Company, and DOTD's acknowledgement in 1983 that "flashing lights at the Van Ply location" were required; it breached this duty by its failure to install these devices timely; and this breach was a cause-in-fact of Archon's death in 1989.
In establishing a negligence cause of action, a plaintiff must demonstrate the following five elements: 1) duty; 2) breach; 3) cause-in-fact; 4) legal cause (or scope of liability); and 5) damages. Fowler v. Roberts, 556 So.2d 1, 4 (La.1989). We believe that the Archon plaintiffs have met their burden of proof as to all five elements.
We will first explore the origin of DOTD's duty regarding Van-Ply Road. Because Van-Ply Road is a parish road, the police jury ordinarily would be responsible for placing and maintaining all traffic signs and controls thereon "sufficient to warn motorists of hazardous conditions." See Douget v. Allen Parish Police Jury, 520 So.2d 813, 815 (La.Ct.App. 3d Cir.1987); La.Rev.Stat. Ann. § 32:235(B) (West 1989).[4] An examination of the history of the Van-Ply crossing, however, reveals that DOTD assumed a duty to provide advance warning signs for that crossing. Although over the years, DOTD had repeated involvement in the construction[5] *991 and subsequent upgrade of what is concededly a parish road, this alone would not compel us to conclude that DOTD had assumed a continuing duty regarding the crossing. See Laque v. St. Charles Parish, 444 So.2d 742 (La.Ct.App. 5th Cir.1984); Andrus v. Police Jury of Parish of Lafayette, 303 So.2d 824 (La.Ct.App. 3d Cir.1975). Rather, DOTD's duty in this case arises from an agreement, dated November 12, 1964, between the State of Louisiana Department of Highways ("the Department") and Missouri Pacific Railroad, for a joint project, No. 713-17-37, to "improv[e] the Van Ply Corporation Access Road." In Article VI of that agreement, the Department expressly agreed that it, "at its sole cost and expense, shall furnish, install and maintain any advance warning signs which may be required." (emphasis added).
In addition, on April 29, 1976, the Department and the Railroad executed another, more general agreement styled "State of Louisiana Department of Highways Railway-Highway Master Agreement for Railway-Highway Grade Crossing Improvements and/or Grade Crossing Warning Devices Statewide."[6] This agreement provided that specific project improvements under the Agreement would be initiated by the Department's serving on the Company a "Project Notice." DOTD and the Railroad were to make a joint inspection of each site and mutually agree on the proposed improvements. The Railroad was obligated to prepare plans and estimates for the work, subject to DOTD's approval. After the work was completed, a joint inspection of the site would be made. In another provision, the Department agreed to furnish, install, and maintain at its own expense any "`Railroad Advance Warning' signs which may be required [prior to the placement of] ... Railroad Grade Crossing Warning Devices installed under the respective `Project Notice.' "[7]
As a result of this agreement, the Department obligated itself to initiate upgrade projects at various sites throughout the state by means of Project Notices to the Railroad, to inspect each selected site, and to review and approve plans for each project. In addition, the Department obligated itself to furnish and install railroad warning signs in that interim period after warning devices were deemed necessary and prior to their installation.
In 1983, these agreements were called into play when DOTD issued a Project Notice for the Van-Ply crossing using the same state project number (XXX-XX-XX) that was utilized during the crossing's initial construction in 1964. In a letter dated May 24, 1983 to C.D. Barton, Chief Engineer for the Railroad, Michael J. Morgan, Agreements Engineer for DOTD,[8] noted that an "on-site inspection has been scheduled for Wednesday, June 1, 1983" at several grade crossings including, inter alia, the Van-Ply crossing. In *992 this same letter, Morgan observes that "[a] new rubber pad grade crossing with subbase treatment and flashing lights at the Van Ply location will be required." (emphasis added). In another letter, dated July 27, 1983, Morgan notes that this project was expressly "made a part of the Master Agreement dated April 29, 1976 by a `Project Notice' signed July 23, 1983 ... between the [Railroad] and Louisiana Department of Transportation, Office of Highways." The Project Notice called for the installation of a new timber crossing at the Van-Ply crossing. Morgan also notes that DOTD will make a final inspection of the site after the completion of the work.
Van-Ply Road is a parish road, and ordinarily, DOTD has no duty to maintain or signalize any such crossing, the exception being when the state has contracted or otherwise assumed a duty to maintain it. From the foregoing recitation of facts surrounding the construction and subsequent upgrade of the Van-Ply crossing, we conclude that, by entering into these agreements with the Railroad, DOTD assumed a contractual duty to warn the motoring public of hazards at the Van-Ply crossing.[9] Although the Parish agreed to maintain any warning mechanisms after their installation, DOTD had the initial responsibility to furnish and install them. The duty to furnish and install an active warning sign or device is obviously different and distinct from the duty to maintain such devices or signs after their installation.
DOTD's 1983 mandate that flashing lights be installed at the Van-Ply crossing reflects its familiarity with the site and recognition of the need to provide more adequate warning devices to protect the motoring public. By means of the 1964 Agreement and the 1976 statewide agreement, DOTD expressly assumed the responsibility for providing such warning devices at this crossing. Because we find that DOTD contractually assumed a duty regarding this crossing,[10] we need not consider plaintiffs' arguments that DOTD assumed a duty merely because of its acceptance of federal funds in the early 1980s to upgrade off-system crossings or because of its eventual selection of the site for upgrade in 1989.[11]
DOTD also argues that it was not responsible for the Van-Ply crossing during the interim period after selection in 1989 and before the active signalization was to be put in place. In so arguing, however, DOTD fails to note that the 1976 Master Agreement obligated it to "furnish, install and maintain any `Railroad Advance Warning Signs' which may be required in advance of [the placement of] Railroad Grade Crossing Warning Devices." DOTD's delay in installing the required flashing lights at the site in 1983 triggered its obligation under the 1976 Master Agreement to install railroad advance warning signs in that interim period until such devices were installed.
Having concluded that DOTD had a duty to install any active warning devices required at the Van-Ply crossing because it had assumed such a duty under the 1964 and *993 1976 agreements, we now consider whether DOTD indeed breached that duty.
The 1964 Agreement between the Department of Highways and the Railroad compelled DOTD to furnish and install any "advance warning signs which may be required" at the Van-Ply crossing. Moreover, the 1976 statewide agreement compels the state to furnish and install advance warning signs in that interim period after active warning devices are deemed necessary and prior to their installation. The 1983 letter from Morgan, Agreements Engineer for DOTD, to Barton, Chief Engineer for the Railroad, indicated that flashing lights were required at the Van-Ply crossing. In addition, a March 22, 1985 letter from A.G. Quirk, State Engineer for DOTD, to Mr. A. Dunn, District Administrator for DOTD in Lake Charles, Louisiana, points out that "there was only 1 railroad crossing sign on the east side of the track [at the Van Ply crossing] mounted on a 6 × 6 post."[12] Although recognizing that such warning devices were required, and after obligating itself to furnish and install them, DOTD failed to follow through on their 1983 commitment to install such devices while the site was resurfaced in 1983. We find no explanation in the record as to why DOTD failed to install these lights or any other advance warning devices after having recognized the danger presented to the motoring public at the Van-Ply crossing.[13] This failure, we believe, constitutes a breach of the duty assumed by DOTD to provide advance warning signs at that site.
We note here, however, that there was no negligence relative to DOTD's activities as a conduit for the federal highway aid program once the site was selected for upgrade in May, 1989. Archon was struck and killed in June, 1989, only one month after the crossing was selected for upgrade. Although in Rick we found that DOTD had a duty to timely upgrade once a site is so selected, we find no breach of this duty in the instant case because only one month had passed since the site was selected before Archon was killed.
We turn now to the remaining elements of plaintiffs' negligence cause of action. The parties have not disputed the lower courts' findings as to scope of protection or damages. We will therefore focus only on the cause-in-fact element.
The parties' arguments regarding cause-in-fact have centered around DOTD's reliance on outdated data in prioritizing the Van-Ply crossing for upgrade. Because we have concluded that DOTD's breach of duty occurred before the site was later considered and selected for upgrade in 1989, we focus our causation analysis on whether DOTD's failure to honor its own 1983 commitment to install flashing lights at the crossing was a cause-in-fact of Archon's death.[14]
*994 It is clear that had DOTD installed the recommended flashing lights (or some other automatic advance warning device) in 1983, Archon would not have had to "creep" up to the tracks to see beyond the boxcars on the side rail to determine whether a train was coming. Instead, he could have relied on the flashing lights to warn him of the train's imminent approach. Although there were passive warning devices in place at that site, these devices served only to inform motorists that they were approaching a railroad crossing, and thus needed to proceed with caution.[15] These signs failed to warn of the train's imminent approach, which information was critical given the obstruction created by boxcars repeatedly left on the side track, as well as the volume and nature of traffic in the area.[16]
In Rick, we noted that where warning devices are present, a motorist normally will act with due regard for his own safety and heed those warnings. See Rick v. State, DOTD, Nos. 93-1776 and 93-1784 (La. 1/14/94), 630 So.2d 1271, 1275. There is no reason in the instant case to believe that Archon would not likewise have acted with due regard for his own safety and heeded any flashing lights or other warning devices present at the Van-Ply crossing. We conclude that DOTD's failure to heed its own mandate to install flashing lights at the Van-Ply crossing was a cause-in-fact of Archon's death.
Finally, we examine DOTD's contention that the lower courts erred in finding that it had notice of defects at the Van-Ply crossing so as to be held liable pursuant to LSA-R.S. 9:2800. In light of DOTD's recognition in 1983 that the Van-Ply crossing needed active warnings devices ("flashing lights"), as well as the letter writing campaign directed to DOTD in December, 1987, and later in 1988, identifying the problem and requesting assistance in upgrading the crossing, we find that DOTD had all the notice necessary under the statute.[17]

II. The Discretionary Function Exception of LSA-R.S. 9:2798.1

Having found that DOTD was negligent in failing to install adequate warning signs or devices at the Van-Ply crossing and that this breach was a cause-in-fact of Archon's death, we now consider DOTD's assertion that the discretionary function exception of LSA-R.S. 9:2798.1 operates to shield it from liability.
LSA-R.S. 9:2798.1 provides immunity from liability for "public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary *995 acts when such acts are within the course and scope of their lawful powers and duties." We have adopted a two-step test for determining when this exception applies. See Fowler v. Roberts, 556 So.2d 1, 15 (La.1989) (citing Berkovitz by Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). First, the court must determine whether the government action is a matter of choice. If it is not (because some statute, regulation, or policy prescribes a specific course of action to follow), then the exception does not apply and there is no immunity. On the other hand, if the action does involve an element of choice or discretion, then the court must determine "whether that discretion is the kind which is shielded by the exception, that is, one grounded in social, economic or political policy." Id. Only those actions based on public policy are protected by the statute. Id.
In evaluating DOTD's actions in this case, we are mindful of dicta in Rick that the selection of one crossing in preference to another equally deserving crossing is more likely a policy decision and thus, by implication, shielded under the discretionary function exception. In that same case, however, we deemed as operational negligence, and thus not protected, DOTD's negligence in failing to obtain a timely response from the railroad regarding the upgrade plans after the site had been selected.
DOTD argues that in the instant case no such operational negligence occurred as the upgrade process was not unduly delayed.[18] While we agree with DOTD's contention that it proceeded efficiently through the federal approval process once the Van-Ply crossing was finally selected for improvement, we refuse to extend immunity to DOTD's failure to install flashing lights (or provide some other more adequate warning device) after it had acknowledged in 1983 that such action was required. DOTD's failure to follow through on, or implement, its mandate to install these warning devices is operational negligence not protected by LSA-R.S. 9:2798.1.[19] We agree *996 with the California Supreme Court observation that "[a] governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan." See Baldwin v. State, 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121, 1127 (1972). In Rick, we criticized and deemed as operational negligence DOTD's failure to monitor the railroad's approval of the planned upgrade because it resulted in delayed implementation of the decision to improve the crossing. DOTD's fault in this case lies not in any policy decision, as that decision had already been made, but in its ignoring the numerous complaints, as well as its own findings, regarding the hazardous nature of the Van-Ply crossing and the obvious need for, and its promise to install, active signalization.
DOTD has not suggested any social, economic, or political policy that was the basis for its failure to comply with its own mandate; rather, DOTD appears to have simply forgotten the obligation it had taken on, and it provides no explanation for that lapse. Nor does it attempt to explain why it ignored the repeated letters it had received as early as December, 1987 requesting investigation of the crossing. As we noted in Fowler, "[w]hen the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures." Fowler v. Roberts, 556 So.2d 1, 15-16 (La.1989). Thus, the decision whether or not to require flashing lights at the crossing might have been one for which DOTD had no liability because that decision necessarily involves the exercise of governmental discretion. On the other hand, the lengthy delay of over six years in effectuating a decision already made is not a discretionary call that qualifies for similar treatment.

III. Evidence

Finally, we turn to DOTD's contention that the lower courts improperly relied on evidence made inadmissible by 23 U.S.C. § 409. DOTD filed a motion in limine seeking to exclude some documents and testimony, as well as any evidence of prior accidents.
In response to DOTD's motion in limine, the trial judge excluded all AAR crossing lists prepared by DOTD, the crossing inventory dated May 3, 1990, the vehicle and pedestrian summary performed on March 30-31, 1989, and the cost estimate for installation of flashing lights and signals. However, the trial judge refused to exclude "testimonial evidence of both lay witnesses and experts concerning the contents of these documents." He also refused to exclude the following: 1) diagnostic survey performed by the Railroad on December 17, 1987; 2) May 2, 1989 letter from P.J. Frederick (DOTD) to C. Shoemaker (Railroad) and attached On-Site Inspection Checklist and Drawings; 3) September 21, 1989 letter from P.J. Frederick (DOTD) to Joe Adams regarding State Project # XXX-XX-XX and attachments; 4) Project Request dated April 3, 1989; 5) Project Notice for Railway/Highway Master Agreement; 6) Letter of Approval and/or Authorization; and 7) evidence of prior accidents. See Judgment Concerning Motions in Limine to Exclude Certain Documents and Testimony Under 23 U.S.C. § 409 (June 15, 1992).
We conclude that DOTD's Section 409 argument, even if valid in part, is of no consequence. Although we recently had reason to discuss Section 409 in Wiedeman v. Dixie Elec. Membership Corp., 627 So.2d 170 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994), we find no need to consider it here. In the overall context of this case, the admission of these documents cannot have prejudiced DOTD or affected the outcome because we resolve this case on the strength and applicability of the 1964 and 1976 Agreements, as well as DOTD's 1983 letter, and not upon any documents associated with the federal upgrade program. The plaintiffs prevail here on the basis of these earlier agreements which gave rise to DOTD's obligation in 1983 to install flashing lights at the crossing, documents *997 outside the scope of 23 U.S.C. § 409.[20] Since DOTD's duty was not grounded in the federal highway-aid program, the admissibility or inadmissibility of documents relating to an upgrade project under that program is irrelevant to our ultimate conclusion that DOTD assumed a duty under certain earlier, independent contractual agreements. Accordingly, DOTD's allegation that the trial court erred by improperly relying on evidence inadmissible under 23 U.S.C. § 409 is without merit.
For the same reason, we also find that DOTD was not prejudiced by the trial judge's decision to allow testimony regarding information compiled in the excluded documents. Moreover, DOTD fails to specify what testimony was improperly admitted and we do not readily find it in the record.
Finally, we find no error in the trial court's decision to admit evidence and testimony regarding prior accidents at the Van-Ply crossing.[21] This evidence, in the form of accident reports or the testimony of previous accident victims, is clearly admissible under 23 U.S.C. § 409.

IV. Conclusion

We conclude that DOTD had expressly assumed a duty to provide warnings to the motoring public at the Van-Ply crossing and its breach of that duty was a cause-in-fact of Archon's death. Moreover, we have determined that the discretionary function exception of LSA-R.S. 9:2798.1 does not operate in this instance to shield DOTD from liability for its operational negligence in failing to honor its own commitment to install active signalization at the Van Ply Crossing. Further, we find that any errors that may have been committed by the trial judge in admitting certain evidence and testimony contrary to 23 U.S.C. § 409's exclusionary rule were harmless. Finally, we find nothing manifestly erroneous or clearly wrong in the lower courts' determination and allocation of fault to DOTD, the Allen Parish Police Jury, the Railroad, and Archon.

DECREE
Accordingly, the judgment of the court of appeal is affirmed.
AFFIRMED.
NOTES
[*] Judge Henry L. Yelverton, Court of Appeal, Third Circuit, who sat for the hearing cycle of April 10-13, 1995, by assignment as Justice Pro Tempore in place of Justice James L. Dennis, Associate Justice, was not on panel for this case. Supreme Court Rule IV, Part 2, § 3. See State v. Barras, 615 So.2d 285, 286 n. 1 (La.1993).
[1] The amount of time that Archon's view was blocked by the side car is dependent on his rate of travel, which was estimated by the parties' experts to be either 1.54 mph or 3 mph.
[2] In its brief in opposition to the plaintiffs' writ application, the Police Jury suggests that in such event, we reallocate DOTD's fault to Archon and the Railroad. DOTD would have us re-apportion it equally among Archon, the Railroad, and the Police Jury.
[3] LSA-R.S. 9:2800 provides that a public entity can be held liable under Civil Code article 2317 for "the condition of things within its care and custody [if] ... the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." La.Rev.Stat.Ann. § 9:2800(A)(B) (West 1991).
[4] LSA-R.S. 32:235(B) requires that "[l]ocal municipal and parish authorities in their respective jurisdictions ... place and maintain such traffic control devices upon highways under their jurisdiction as they may deem necessary...." La. Rev.Stat.Ann. § 32:235(B) (West 1989).
[5] In Allen Parish Police Jury Resolution No. 3107, dated August 17, 1964, the Police Jury "requested [that the Department of Highways]... perform [the following] construction work... with the Maintenance Forces of the Department of Highways: Clearing, embankment, drainage structures, base and bituminous surface treatment for construction of the Van Ply Access Road." In this same Resolution, the Police Jury agreed to assume full responsibility for the maintenance of this construction work after its completion. The Resolution further provided that "[t]he construction work shall be performed under the sole supervision of the Maintenance Section [of the Department of Highways] and with the personnel, equipment and material which, in its opinion, are required for the satisfactory completion thereof."
[6] We note that neither this agreement, nor the 1964 construction agreement, had an expiration date.
[7] The railroad, however, agreed to "maintain and operate the crossing warning devices relocated and/or installed under th[e] agreement," but any warning device discontinued at one site and not needed at any other would become the property of the Department.
[8] As Agreements Engineer for DOTD from November, 1981 to some time in 1990, Morgan was in charge of DOTD's crossing upgrade program. (R. at 1554). He was also designated by DOTD to serve as its LSA-C.C.P. Article 1442 representative. LSA-C.C.P. article 1442 requires a governmental agency to "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf...." La.Code Civ.Proc. art. 1442 (West 1984).
[9] See Arnold v. Illinois Cent. Gulf R.R., 501 So.2d 778 (La.Ct.App. 1st Cir.1986) (holding DOTD responsible for railroad crossing accident on local road not because DOTD participated in the federal funding program, but because DOTD had undertaken the responsibility for marking the crossing), writ denied, 503 So.2d 479 (La. 1987); Hodges v. State, Through Dep't of Highways, 370 So.2d 1274, 1278 (La.Ct.App. 3d Cir.) (stating that "[w]here the state undertakes the job of signing an intersection [involving a parish road], it must do so properly with due care for the traveling public"), writ denied, 374 So.2d 660 (La.), writ denied, 374 So.2d 661 (La.1979); Adamski v. Burdell, 363 So.2d 1316, 1320 (La.Ct.App. 4th Cir.1978) (declaring that city, though having "no duty to erect signs or other traffic controls" may be held liable for its failure to so do where it has assumed such a duty).
[10] See La.Civ.Code Ann. art. 1757 (West 1995) ("Obligations arise from contracts and other declarations of will").
[11] The author of this opinion has expressed his view that the mere allocation of federal funds to the state to make railroad grade crossing improvements does not trigger the state's duty to provide protective devices at railroad crossings for off-system roads. See Rick v. State, DOTD, No. 93-1776 and 93-1784 (La. 1/14/94), 630 So.2d 1271 (Calogero, C.J., dissenting). See also Webb v. Southern Pac. R.R. Co., 617 So.2d 618 (La.Ct.App. 3d Cir.), writ denied, 625 So.2d 180 (La.1993); Laque v. St. Charles Parish, 444 So.2d 742 (La.Ct.App. 5th Cir.1984).
[12] Ironically, although no additional warning devices were installed, Woodson Harvey, III (DOTD) wrote an intradepartmental letter dated November 18, 1986 to Oscar Cruz, Construction Estimates Engineer (DOTD) in which Harvey noted that a visual inspection of the Van-Ply crossing was made on March 6, 1985, "at which time all visible components were [deemed] in place and the crossing was functioning properly." In January 6, 1987, Joseph L. Wax, Deputy Undersecretary of DOTD, signed a Notice of Completion stating that: "ALL PHASES OF WORK UNDER THIS PROJECT [XXX-XX-XX] ARE COMPLETED] TO BE MAINTAINED BY MISSOURI PACIFIC RAILROAD COMPANY."
[13] During cross examination, William Lee Haymon, former District Administrator in Lake Charles District for DOTD, admitted that he was not aware of the 1964 agreement "on the Van Ply Road that the Department was going to furnish, install and maintain any advance warning signs which might be required" even though the road was in his district in 1964. He also testified that no one in Baton Rouge called him to inform him of the contract. Finally, when asked "if [he] had been aware that the State had entered into an agreement with the railroad to furnish, install and maintain any advance warning signs which may be required, would [he] have checked to see if one needed to be put in place[,]" Haymon responded, "We would have had someone do it. Yes, Sir." (R. at 1509).
[14] DOTD relied on outdated data, including an inaccurate train count and an incomplete listing of prior accidents, in formulating the hazard index for the Van-Ply crossing. Arguably, this faulty reliance resulted in the assignment of a much lower hazard index to the site than was warranted. This in turn may have contributed to the delay in the improvement of this site. In Rick, such fault was deemed to be operational negligence and thus, not shielded by the discretionary function exception to LSA-R.S. 9:2798.1. See Rick v. State, DOTD, Nos. 93-1776 and 93-1784 (La. 1/14/94), 630 So.2d 1271, 1276.
[15] The trial court allocated 32% fault to Archon for his failure to see the train coming. The court of appeal affirmed this allocation of fault, but they also noted that although Archon had approached the crossing cautiously, he probably "would have acted with even greater caution once he observed flashing lights and/or a gate at the crossing."
[16] Testimony at trial established that there was an average of at least one hundred logging trucks, as well as approximately 350 people employed at the nearby Boise Cascade plant, traversing the track on a daily basis.
[17] This letter writing campaign included the following activities. On December 11, 1987, R.K. Rouse, Public Project Engineer for the railroad, referencing a telephone call to Morgan on December 7, 1987 regarding the Van-Ply crossing, sent Morgan for his "review and further consideration in determining th[e] priority and merits of" the proposal to the installation of warning devices copies of various letters which the railroad received regarding the crossing. These letters were from the Mayor of the City of Oakdale, Representative James David Cain, the Secretary-Treasurer of the Allen Parish Police Jury (coupled with a copy of Resolution 4906 of October 5, 1987 asking the railroad to install flashing lights at the crossing), and Ron Rutkowski, plant manager at Boise Cascade.

On November 8, 1988, P.N. Crabtree, Superintendent of Transportation Services for Union Pacific, sent Morgan copies of additional letters from Representative Cain and Rutkowski, as well as photos of a then-recent accident at the crossing.
Finally, on March 29, 1989, Haymon, Lake Charles District Administrator for DOTD, sent to P.J. Frederick, Maintenance Engineering Administrator for DOTD, a copy of a request from Boise Cascade for signalization of the crossing, attached to which was a "package of chronological letters" representing the letter writing campaign to get the crossing upgraded. In his memorandum to Frederick, Haymon notes his agreement with Rutkowski's assertion that additional traffic controls were required.
[18] In this case, DOTD notes that only four months passed between the time the inspection check was submitted to the Railroad so that the Railroad could prepare plans and estimates for the improvement, and the Railroad's receiving authorization to commence work under the approved final project agreement. Contrasting this scenario with Rick, DOTD argues it was not negligent here because it diligently followed the procedures prescribed in Title 23. In fact, the accident here took place only 6 weeks after the inspection check was submitted to the railroad. Federal approval for the project was obtained shortly thereafter in September, 1989.
[19] We note that other courts have similarly concluded that a government body's failure to implement a plan or decision constitutes operational negligence. See, e.g., Johnson v. State, 636 P.2d 47, 63 (Alaska 1981) (holding that "once the state made the decision to construct the road and crossing, the discretionary function immunity did not protect it from possible negligence liability in the operational carrying out of the basic policy-planning decision to build"); Harrison v. Escambia County School Board, 419 So.2d 640, 647 (Fla.Dist.Ct.App.1982) (noting in dicta that where "additional signals were planned before, but installed after the accident, and the Department was charged with the responsibility for planning and maintaining the crossing," the court might find that such activity was not shielded), approved sub nom. Harrison v. Escambia County Sch. Bd., 434 So.2d 316 (Fla.1983); McEwen v. Burlington N. R.R., Co., 494 N.W.2d 313 (Minn.Ct.App.1992) (Randall, J., concurring in part, dissenting in part) (distinguishing between state's original decision to resurface road and repaint pavement markings from its decision to wait 19 days, instead of its usual 10, to repaint pavement markings after resurfacing, deeming the former as protected and the latter, an operational decision, as not), review denied, 1993 Minn. LEXIS 135 (Minn.1993); Hull v. Baltimore & Ohio R.R. Co., 524 N.E.2d 175 (Ohio Ct.App. 1987) (noting that although in instant case, township's decision not to install and maintain warning devices at railroad was immunized, "once the decision has been made to engage in a certain activity or function, municipalities will be held liable the same as private corporations or persons for the negligence of their employees in the performance of their duties"); Duncan v. Union Pac. R.R. Co., 842 P.2d 832, 839 (Utah 1992) (Stewart, Durham, JJ., dissenting) (arguing that failure to implement a previously-made decision to upgrade warning signals at railroad crossing constitutes operational negligence). Contra Manna v. State, 129 N.J. 341, 609 A.2d 757 (1992) (finding under state's plan or design immunity statute, that such protection is perpetual).

At least two Louisiana cases have gone so far as to hold that the decision "[w]hether or not to place warning signs at a particular intersection or crossing" is "an operational decision, not a policy-making or discretionary function decision for which La.R.S. 9:2798.1 provides immunity" because "the policy decision, to keep the roadways in a reasonably safe condition, has already been made by the legislature." See Estate of Thomas v. State, DOTD, 604 So.2d 617, 625 (La.Ct.App. 2d Cir.), writ denied, 608 So.2d 167 (La.1992); Chaney v. National R.R. Passenger Corp., 583 So.2d 926, 929 (La.Ct.App. 1st Cir. 1991). We need not, at this time, address the validity of this assertion because the parties have not questioned the merits of DOTD's conclusion that active signalization was required at the Van-Ply crossing.
[20] 23 U.S.C. § 409 provides as follows:

Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for any other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
[21] There were three accidents at the Van-Ply crossing prior to the Archon accident: November 9, 1984; February 10, 1986, and October 5, 1988. Of these, only the 1986 accident appeared in the FRA ("Federal Railroad Administration") reports relied on by the state in evaluating the Van-Ply crossing. Morgan testified at trial that DOTD did not avail itself of State Department of Public Safety accident reports. (R. at 1609).